UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
LAWRENCE A. SCHULER, *Individually and*          :
*On Behalf of All Others Similarly Situated*,

                                                 :

                          Plaintiffs,

                                                 :          No. 11 Civ. 2484 (KMW) (FM)
                  -against-

                                                 :          **ORDER & OPINION**

NIVS INTELLIMEDIA TECHNOLOGY
GROUP, INC., et al.,                             :

                          Defendants.            :
----------------------------------------------------------------X
KIMBA M. WOOD, U.S.D.J.:

    Plaintiffs are purchasers of common stock of NIVS Intellimedia Technology Group

("NIVS" or "the Company").  Plaintiffs claim to have purchased NIVS stock on the American

Stock Exchange at artificially inflated prices and suffered losses when the stock's value

precipitously declined.  In this putative class action, Plaintiffs allege that NIVS, a Chinese

corporation; certain of NIVS's directors; its U.S. underwriters, Rodman & Renshaw LLC

("R&R") and WestPark Capital, Inc. ("Westpark"); and its U.S. auditor, MaloneBailey LLP

("MaloneBailey"), made false and misleading statements that caused the artificial inflation of

NIVS's stock.  Plaintiffs' Consolidated Amended Complaint ("CAC") asserts claims under the

Securities Act of 1933 (the "Securities Act"), and the Securities Exchange Act of 1934 (the

"Exchange Act").  [Dkt. No. 66].

    R&R, WestPark, and MaloneBailey (collectively, "the Underwriter Defendants") now

move, pursuant to Federal Rules of Civil Procedure 8, 9, and 12, and the Private Securities

Litigation Reform Act ("PLSRA"), to dismiss the CAC.  [Dkt. Nos. 75, 78, 80].  For the reasons

that follow, the Underwriter Defendants' motions are GRANTED.

I.      **FACTUAL BACKGROUND**

A. **NIVS's Reverse Merger & the Second Public Offering**

NIVS is a Delaware corporation with its principal offices in the People's Republic of China. (CAC ¶ 66). NIVS designs, manufactures, markets, and sells consumer electronic products, including "home audio products, premium home theater systems, speakers, shelf-stereo systems, [and] digital players." (*Id.* ¶¶ 7, 24, 26). NIVS sells these products at over 8,000 points of sale in China and through various international channels. (*Id.* ¶ 32).

NIVS stock came to be traded on the American Stock Exchange through a process known as a "reverse merger." (*Id.* ¶ 33). In a reverse merger, a foreign business is acquired by a U.S. shell company that is already publicly traded. Following the merger, the U.S. board of directors resigns, and the foreign board takes over. (*Id.*). The new board then issues new stock, thereby raising fresh capital. (*Id.* ¶ 4). At the same time, because the company's assets and operations remain largely abroad, they are somewhat shielded from U.S. oversight. (*Id.* ¶¶ 34-35). The CAC details reports of fraud associated with reverse Chinese mergers ("RCMs"). (*Id.* ¶¶ 36-41).

In April 2010, after completion of its RCM, NIVS announced a Second Public Offering of common stock ("the SPO"). In the time leading up to the SPO, NIVS reported "seemingly amazing growth and profits." (*Id.* ¶ 8). The SPO offered seven million shares at $3.29 per share, and ultimately raised approximately $22 million. (*Id.* ¶¶ 9, 83). The Underwriter Defendants received $1.5 million for their services. (*Id.* ¶ 64). NIVS also granted the Underwriter Defendants "a 45-day option to purchase up to an additional 1,094,224 shares." (*Id.* ¶ 85).

In connection with the SPO, NIVS filed a number of "Offering Documents" with the SEC.[1] These documents incorporated an audit opinion from NIVS's auditor, MaloneBailey.

---

[1] These Offering Documents include: a Form 424B3 prospectus (the "Prospectus"), a Form S-1 Registration Statement (the "Registration Statement") filed on March 4, 2010, a Form S-1/A Pre Effective

Having served as outside auditor for numerous reverse mergers, MaloneBailey describes itself as a "market leader in serving SEC clients in China." (*Id.* ¶¶ 47, 257). MaloneBailey's performance, however, has been repeatedly cited by financial regulators for various deficiencies. (*See id.* ¶¶ 49-52). MaloneBailey served as NIVS's auditor from January 21, 2010 until its resignation in 2011. (*Id.* ¶ 138). In connection with the SPO, MaloneBailey audited NIVS's 2009 balance sheet and other financial documents. In its 2009 audit opinion, MaloneBailey confirmed the accuracy of NIVS's financial documents and consented to the inclusion of these audited financials into various public documents. (*Id.* ¶¶ 77, 138).

R&R and WestPark acted as "joint book-running managers" for the SPO. (*Id.* ¶¶ 74-76). WestPark's CEO, Richard Rappaport, purportedly invented the reverse merger mechanism. (*Id.* ¶ 42). Including NIVS, WestPark completed five RCMs; "*four* out of those five companies have had the trading of their common stock halted by American stock exchanges." (*Id.*). The CAC cites various public criticisms of WestPark's role in these reverse mergers, (*id.* ¶¶ 44-45), and details instances when Westpark has been disciplined by securities regulators, (*id.* ¶ 43).

Plaintiffs are purchasers of NIVS common stock. Plaintiffs' Security Act claims are on behalf of all persons who purchased stock in the SPO, commencing on or about April 20, 2010. (*Id.* ¶¶ 2, 64). Plaintiffs assert Exchange Act claims on behalf of shareholders who purchased stock between March 24, 2010 and March 25, 2011. (*Id.* ¶ 1). The CAC names one plaintiff, Edward Fritsche, who allegedly purchased stock "at artificially inflated prices." (*Id.* ¶ 126).[2]

---

Amendment No. 1 filed on March 26, 2010, a Form S-1/A Pre-Effective Amendment No. 2 filed on April 19, 2010, and an updated Form S-1 Registration Statement filed on April 20, 2010. (CAC ¶ 84).

[2] Allegations relating to Plaintiff Schuler, the captioned plaintiff, were included in the original complaint, [Dkt. No. 1], but were omitted from the CAC. The Exchange Act allegations name two plaintiffs: Allan Lyons and Edward Fritsche. (CAC ¶¶ 125-26). Before Plaintiffs filed the CAC, the Court appointed Allan Lyons as Lead Plaintiff. [Dkt. No. 31]. The CAC, however, includes no details regarding Lyons' purchases and sales. Accordingly, the Court can address the adequacy of the CAC only with respect to Plaintiff Fritsche. Plaintiffs do not argue otherwise.

### B.  NIVS's Stock Decline

For some time after the SPO, NIVS continued to report positive revenue and income. (CAC ¶¶ 10-11).  On March 24, 2011, however, the public learned that American Stock Exchange regulators decided to halt all trading of NIVS stock.  The regulators stated that they were "evaluating both the need for certain public disclosure, as well as the overall suitability for continued listing of the Company's common stock."  (*Id.* ¶ 203).

The next day, MaloneBailey resigned.  In its letter of resignation, MaloneBailey stated that it had uncovered "massive accounting fraud" involving forged accounting records and bank statements.  (*Id.* ¶¶ 13, 204).  After these discoveries, MaloneBailey had "encountered difficulties with [NIVS] management trying to limit [the] scope of the NIVS audit."  (*Id.* ¶ 206). As a result of these "irregularities and fraud," MaloneBailey stated that it "could no longer support its audit opinion for the year end 2009" and resigned.  (*Id.* ¶¶ 13, 14, 205).

On March 31, 2011, NIVS revealed it would not file its 2010 annual report.  (*Id.* ¶¶ 208, 210).  NIVS's stock was soon delisted, and the SEC launched a formal investigation.  (*Id.* ¶¶ 15, 211-216).  Two months later, trading reopened for a fraction of its original value on "the grey market," an unofficial (but legal) system of trades outside of formal channels.  (*Id.* ¶ 16).

### C.  Allegedly False and Misleading Statements

The CAC includes numerous excerpts from NIVS's financial statements, which allegedly overstated the Company's financial health during the time leading up to and immediately following the SPO.  For example, the CAC alleges that the Offering Documents contain material misstatements and omissions regarding NIVS's business, operations, and income.  (CAC ¶ 87). In particular, NIVS's year end 2008 filings indicate that revenues increased 85%, to $143.6 million, and that net income grew 54%, to $13 million.  The 2009 filings indicate a robust 29%

increase in sales and an 80.8% increase in net income.  (*Id.* ¶¶ 89, 8).  The CAC alleges that these extraordinary increases were fabricated.

The CAC further asserts that the Offering Documents contain false and misleading statements concerning MaloneBailey's work.  (*Id.* ¶ 95).  MaloneBailey, having assured itself that the relevant financial documents provided "a reasonable basis" for its opinion, attested that:

> In our opinion, the consolidated financial statements . . . present fairly, in all material respects, the financial position of NIVS . . . as of December 31, 2009, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.  Also, in our opinion, the related financial statement schedule, when considered in relation to the consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

(*Id.* ¶ 96, *see also id.* ¶¶ 97, 98, 139).

### i.    *Securities Act Allegations*

Plaintiffs contend that their claims under Sections 11 and 12(a)(2) of the Securities Act do not rely on allegations of "fraud, scienter, or the intent of the Defendants to defraud Plaintiffs," but instead "are predicated upon Defendants' strict liability for making false and materially misleading statements in the Offering Documents."  (CAC ¶¶ 107, 111).

In addition to the facts noted above, Plaintiffs support these claims with allegations that NIVS's 2009 financial statements are materially false and misleading for several reasons.  First, the CAC alleges that the financial figures reported to the SEC materially differed from the comparable figures filed with the SAIC, "the Chinese government agency responsible for drafting and implementing legislation concerning the administration of industry and commerce in China."  (*Id.* ¶¶ 100, 54).[3]  In particular, the CAC alleges that NIVS's 2009 SEC-reported net

---

[3] The CAC explains that "SAIC regulations are implemented by local AIC branches.  All Chinese companies file a variety of information with their local AIC office, including, among other things, property leases, land use information, business licenses, capital raises, bylaws and, importantly, annual financial statements."  (CAC ¶ 54).

income was $23,457,078, which is 312% of its 2009 SAIC-reported net income of $7,508,000. (*Id.* ¶¶ 61-62). The CAC contends that the SEC figures are likely false because corporations like NIVS have strong incentives (including penalties, fines, and criminal prosecution) to be truthful to the SAIC, but have no such incentives with regard to the SEC, which has no enforcement power over Chinese individuals. (*See id.* ¶¶ 57-60).

The CAC further alleges that NIVS's financial results were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), Generally Accepted Auditing Standards ("GAAS"), or SEC regulations and disclosure rules. (*Id.* ¶¶ 101-104). Next, the CAC asserts that MaloneBailey's statements regarding the adequacy of its audit were "materially false and misleading" and again violated GAAS. (*Id.* ¶ 103). In sum, the CAC asserts that the financial statements lacked any reasonable basis. (*Id.* ¶ 105).

### ii.       *Exchange Act Allegations*

The CAC also asserts a claim against MaloneBailey under Section 10(b) of the Exchange Act. (CAC ¶¶ 280-290). In contrast to the Securities Act claims, this claim alleges that Defendants had "actual knowledge" of the misrepresentations and omissions or acted "with reckless disregard for the truth." (*Id.* ¶ 286). In addition to the 2009 financial statements discussed above, Plaintiffs point to a number of allegedly false and fraudulent statements.[4] These material misrepresentations and omissions were allegedly committed for "the purpose and

---

[4] These allegations include three statements made prior to the SPO: (1) NIVS's Fourth Quarter 2009 Press Release, (CAC ¶¶ 143-45); (2) NIVS's 2009 SEC Form 10-K, as confirmed by MaloneBailey's 2009 audit, (*id.* ¶ 152; *see also id.* ¶¶ 148-52); and (3) a March 25, 2010 conference call, (*id.* ¶¶ 153-55). Additional allegedly false and fraudulent statements include the SPO Offering Documents, *see supra* note 1, and statements following the SPO: (1) a First Quarter 2010 Press Release, (*id.* ¶¶ 157-60); (2) a First Quarter 2010 SEC Form 10-Q, (*id.* ¶¶ 162-65); (3) a First Quarter 2010 conference call, (*id.* ¶ 167); (4) a Second Quarter 2010 Press Release, (*id.* ¶¶ 168, 171-73); (5) a Second Quarter 2010 SEC Form 10-Q, (*id.* ¶ 175-77); (6) a Second Quarter 2010 conference call, (*id.* ¶ 178); (7) a Third Quarter 2010 Press Release, (*id.* ¶¶ 181-83); (8) a Third Quarter 2010 SEC Form 10-Q, (*id.* ¶¶ 185-86); and (9) a Third Quarter 2010 conference call, (*id.* ¶¶ 188-89).

effect of concealing NIVS's operating condition, business practices[,] and future business prospects from the investing public" and were designed to maintain NIVS's stock at an artificially inflated price. (*Id.*). Although these statements vary in their specifics, each included financial figures and projections designed to assure investors of NIVS's financial stability and likelihood of future growth.

Once again, the CAC alleges that these various statements were false and amounted to "massive accounting fraud and irregularities" for many reasons. (*Id.* ¶ 192). First, Plaintiffs reassert their allegations that NIVS's SEC filings differed materially from their SAIC filings. (*Id.* ¶ 193). In addition, NIVS's financial results were not prepared in accordance with GAAP, GAAS, and SEC disclosures rules. (*See id.* ¶¶ 196-199, 219-222). Finally, the CAC alleges that contrary to certifications made pursuant to the Sarbanes-Oxley Act, NIVS lacked "adequate and necessary internal controls." (*Id.* ¶ 200).

Plaintiffs also expound at length regarding how MaloneBailey's 2009 audit violated GAAP, GAAS, and SEC regulations. Plaintiffs assert that MaloneBailey knew or recklessly disregarded non-GAAP accounting and materially false and misleading representations in NIVS's SEC filings. (*Id.* ¶ 225; *see also id.* ¶¶ 226, 233-34 (asserting violations of GAAS)). Plaintiffs allege that MaloneBailey ignored material differences between the 2009 SEC and SAIC filings. (*Id.* ¶ 227; *see also id.* ¶ 237 (noting difference between SEC and SAIC filings)). Plaintiffs also allege that MaloneBailey ignored or recklessly failed to investigate "extremely questionable transactions (such as significant sales that were not supported by customer sales orders, invoices, withdrawals of inventory from the warehouse, and documentation supporting delivery to customers and customer acceptance." (*Id.* ¶ 229; *see also id.* ¶¶ 235-36 (failure to inspect inventory)).

The CAC also identifies numerous "red flags that should have alerted MaloneBailey" of the falsity of NIVS's financial statements.  (*Id.* ¶ 252).  The Complaint notes that MaloneBailey was on notice that: (a) historically, Chinese companies do not have strong corporate governance or internal controls; (b) that NIVS "may have difficulty" hiring and retaining employees with adequate Western training; and (c) that, as a result, NIVS "may experience difficulty in establishing management, legal and financial controls, collecting financial data and preparing financial statements, books of account and corporate records and instituting business practices that meet Western standards."  (*Id.* ¶ 253).  The CAC also notes that MaloneBailey was on notice of NIVS's past "difficulties with its internal controls" and that NIVS's Chairman and CEO had admitted to taking millions of dollars in improper loans from the Company.  (*Id.* ¶¶ 254-55).

### D.  Procedural History

Plaintiffs filed their original class action complaint on April 12, 2011, [Dkt. No. 1], filed an Amended Complaint on December 15, 2011, [Dkt. No. 36], and filed the CAC on March 27, 2012, [Dkt. No. 66].  Each of the Underwriter Defendants subsequently moved to dismiss the CAC, raising a variety of arguments.  [Dkt. Nos. 75 (R&R), 78 (MaloneBailey), 80 (Westpark)].[5]

## II.   PLEADING STANDARDS

### A.  <u>Rule 8, Rule 9, and the PSLRA</u>

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to offer a "short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint governed by Rule 8 "must contain sufficient

---

[5] This case was originally assigned to the Honorable John G. Koeltl, was reassigned to the Honorable Alison J. Nathan on February 14, 2012, and finally was reassigned to the undersigned on January 3, 2013.  [Dkt. Nos. 45, 95].

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In assessing whether a complaint meets this standard, a court examines only well-pleaded factual allegations, disregards legal conclusions, and draws all reasonable inferences in favor of the non-movant.  *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006).  Ultimately, the court must determine whether the allegations of the complaint "plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 678.

A complaint that asserts securities fraud, however, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. § 78u-4; *see ECA & Local 134 IBEW Joint Pension Tr. v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  Rule 9(b) provides that a party alleging fraud "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The Second Circuit interprets this rule to require that a complaint "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Although Rule 9(b) permits "[m]alice, intent, knowledge and other conditions of a person's mind [to be] alleged generally[,]" a plaintiff is nonetheless required to "allege facts that give rise to a strong inference of fraudulent intent."  *Acito v. FMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting Fed. R. Civ. P. 9(b)).  The PSLRA imposes a national pleading standard for private securities fraud actions that "mimics" the Second Circuit's standard under Rule 9(b).  *See Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700, 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10,

9

2012) (Castel, J.) (citing *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000)); *see also Rombach*, 355 F.3d at 170 (discussing PSLRA pleading requirements).

    **B.**  <u>**Whether Rule 8 or Rule 9 Applies to Plaintiffs' Claims**</u>

       The CAC asserts claims against the Underwriter Defendants under both the Securities Act and the Exchange Act.  The Parties agree that the pleading requirements of Rule 9(b) and the PSLRA apply to the Plaintiff's Exchange Act claim.  *See* 15 U.S.C. § 78u-4(b)(2).  The Parties sharply dispute, however, whether these heightened requirements also apply to Plaintiffs' Securities Act claims.

       Sections 11 and 12(a)(2) of the Securities Act impose liability for making certain false or misleading statements, without regard to intent to manipulate or deceive.  *See* 15 U.S.C. §§ 77k (registration statements), 77*l* (prospectuses and communications).  Fraud is not "an an element or a requisite" to such claims.  *Rombach*, 355 F.3d at 171.  Accordingly, such claims are generally subject to the pleading requirements of Rule 8.  "[I]nsofar as the claims are premised on allegations of fraud," however, Rule 9(b)'s heightened pleading standard applies.  *Id.*

       In determining whether a Securities Act claim is "premised on allegations of fraud," courts are to consider the language of the complaint and the nature of the conduct alleged.  *See id.* at 171-72 (applying Rule 9(b)'s requirements where the "wordings and imputations of the complaint" were "classically associated with fraud"); *see also Lewy*, 2012 WL 3957916, at *8 (discussing *Rombach*).  Plaintiffs may draft their complaint in a manner that distinguishes their Securities Act claims (alleging negligence or strict liability) from their Exchange Act claims (alleging fraud).  *See, e.g.*, *Lewy*, 2012 WL 3957916, at *8; *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) (Chin, J.), *aff'd*, 347 F. App'x 665 (2d Cir. 2009); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (Lynch, J.).

As evident from the analysis below, the Court's decision does not turn on whether Rule 8 or Rule 9 applies to Plaintiffs' claims. Accordingly, the Court need not decide whether the structure and allegations of the CAC adequately distinguish Plaintiffs' Securities Act claims from their Exchange Act claim.

## III.  THE SECURITIES ACT CLAIMS

Plaintiffs assert claims under Sections 11 and 12 of the Securities Act. These provisions are "siblings with roughly parallel elements," imposing liability on communications containing a material misstatement or omission. *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 500 (S.D.N.Y. 2010) (Kaplan, J.) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010)) (quotation marks omitted). "Section 11 applies to registration statements while Section 12 applies to prospectuses or oral communications connected with a sale." *Id.* at 500-01. Courts thus typically analyze these claims together. *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 (S.D.N.Y. 2009) (Sullivan, J.).

Defendants raise a variety of arguments to dismiss these claims. In particular, Defendants argue: (1) that Plaintiffs lack both constitutional and statutory standing, (2) that Defendants have established the defense of negative causation, and (3) that Plaintiffs fail to adequately plead their claims. Although the Court finds that Plaintiffs have standing to assert their claims, the Court agrees that Defendants have established negative causation.

### A.  **Standing**

Only Plaintiff Edward Fritsche, on behalf of himself and the class, brings claims under the Securities Act. Defendants challenge Fritsche's standing to bring this claim.

#### i.  *Constitutional Standing*

Defendants first argue that Fritsche has not suffered an injury-in-fact, as required to confer Article III standing.  (*See* R&R Mem. in Supp. 6-9 [Dkt. No. 76]).  According to Defendants, the putative class's damages were caused by the drop in NIVS stock price, which was precipitated by MaloneBailey's revelations regarding NIVS's accounting fraud.  But because Plaintiff Fritsche sold his stock prior to MaloneBailey's disclosures, Defendants argue that he has suffered no cognizable injury.

Article III standing consists of three "irreducible" elements: "(1) *injury-in-fact,* which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) *causation* in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability,* or a non-speculative likelihood that the injury can be remedied by the requested relief."  *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  To establish injury-in-fact, a plaintiff must have personally suffered an injury.  *Id.* at 107; *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  Because "standing is challenged on the basis of the pleadings, [the Court] 'accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'"  *United States v. Vazquez,* 145 F.3d 74, 81 (2d Cir. 1998) (quoting *Warth v. Seldin,* 422 U.S. 490, 501 (1975)).

Although Plaintiffs filed this case as a putative class action, this "adds nothing to the question of standing, for even named plaintiffs who represent a class must allege that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named

plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

The Court finds that the allegations regarding Plaintiff Fritsche's purchases meet the standard for constitutional standing. Fritsche purchased 2000 shares of NIVS stock at the artificially inflated price of $3.29 per share. (CAC ¶¶ 64, 126). He then sold these shares, on November 22, 2010, at $2.32 per share. (*Id.* Ex. A).

At this stage, to establish injury-in-fact, "a plaintiff need only allege that [1] he purchased a security pursuant to a false or misleading registration statement, and that [2] at the time of the sale of the security or at the end of the class period, the value of the security had declined." *Levine*, 508 F. Supp. 2d at 276. Accepting the factual allegations of the CAC as true and construing them in Plaintiffs' favor, the Court finds that Fritsche has standing because he has alleged [1] that he purchased NIVS stock pursuant to false or misleading statements, and [2] that the value of the NIVS stock declined by the time it was sold. *Cf. Policemen's Annuity & Benefit Fund of City of Chi. v. Bank of Am.*, No. 12 Civ. 2865, 2012 WL 6062544, at *6-7 (S.D.N.Y. Dec. 7, 2012) (Forrest, J.).[6]

Defendants' motion to dismiss for lack of constitutional standing is therefore denied.

### *ii. Section 12 Statutory Standing*

Next, Defendants contend that Plaintiffs' Section 12 claim should be dismissed for lack of statutory standing. (*See* WestPark Mem. 15 [Dkt. No. 81]). The Court disagrees.

---

[6] Tellingly, Defendants have not cited a single analogous case where a court has dismissed Section 11 or 12 claims for lack of constitutional standing. For example, *In re Scudder Mutual Funds Fee Litigation*, cited by Defendants, found a lack of standing for claims asserted on behalf of owners of shares of funds that no named plaintiff owned. *See* No. 04 Civ. 1921, 2007 WL 2325862, at *8-10 (S.D.N.Y. Aug. 14, 2007) (Batts, J). Similarly inapposite is *In re AOL Time Warner Securities & ERISA Litigation*, where plaintiff sold the shares in question for *more* than the purchase price. *See* 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004) (Kram, J.).

Section 12 imposes liability on "persons who offer or sell securities and only grants standing to 'the person purchasing such security' from them." *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987).  Thus, a plaintiff has standing to bring a Section 12 claim only against a "statutory seller" from which "it 'purchased' a security." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 310 (S.D.N.Y. 2011) (Kaplan, J.).  A "statutory seller" is one who "in a public offering, either transferred title to the purchaser or successfully solicited the transfer for financial gain." *Id.*

The CAC alleges that NIVS's two underwriters—Westpark and R&R—jointly orchestrated the SPO.  (*See* CAC ¶¶ 74-75).  Westpark argues that because Fritsche does not allege that he purchased securities directly from WestPark, as opposed to R&R, he lacks standing under Section 12.  (WestPark Mem. 15 (citing 15 U.S.C. § 77*l*)).  At this stage of the litigation, Plaintiffs are not required to precisely identify which underwriter sold the securities at issue. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374 (S.D.N.Y. 2011) (Sullivan, J.).  Courts have repeatedly held that it is sufficient to allege that two underwriters were involved in the sale. *E.g., In re Wachovia*, 753 F. Supp. 2d at 374; *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (Cote, J.).[7]

The CAC alleges that on April 20, 2010, the Underwriters "conducted the SPO."  (CAC ¶ 9).  Plaintiff Fritsche purchased 2,000 shares of NIVS stock at the SPO for $3.29 per share.  (*Id.*

---

[7] The Court in *In re UBS AG Securities Litigation*, after distinguishing both *In re Wachovia* and *In re Worldcom*, dismissed plaintiffs' Section 12 claim for "fail[ure] to demonstrate 'statutory seller' standing." *See* No. 07 Civ. 11225, 2012 WL 4471265, at *26-27 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.). In that case, however, the court relied, in part, on the fact that the allegations "d[id] not make clear whether [plaintiffs] purchased the shares directly or in a secondary market 'traceable' to the 2008 Rights Offering." *Id.* at *27.  The CAC has no such difficulties because the relevant class is limited to *direct* purchasers of NIVS securities.  (*See* CAC ¶ 2).  Indeed, whereas the claims in *In re Wachovia*, *In re Worldcom*, and *In re UBS AG* involved purchases at multiple offerings or indirect sales, the CAC focuses on *direct* purchases at a *single* public offering with only two underwriters.  Given this narrow scope, the Court concludes that the CAC meets the standing requirements of Section 12.

¶ 64).  The SPO earned the Underwriters a fee of "nearly $1.5 million."  (*Id.*).  The CAC further alleges that the Underwriters "were sellers, offerors, and/or solicitors of purchasers of the [NIVS] shares," (*id.* ¶ 112), and that the Underwriters' participated in the preparation and dissemination of the SPO Offering Documents, (*id.* ¶ 113).  These allegations are sufficient, when judged against the requirements of Rule 8, to give the Underwriter Defendants "fair notice of the basis for the claims against them, to wit, that they solicited the named plaintiffs in the sale of the [securities] or sold [securities] to them."  *In re WorldCom*, 294 F. Supp. 2d at 423 (citations omitted); *see also In re IndyMac*, 718 F. Supp. 2d at 502 (finding similar factual allegations "sufficient at [the pleading] stage to support a plausible inference that the lead plaintiffs purchased . . . from the specific Underwriter Defendants").

Defendants' motion to dismiss for lack of statutory standing is therefore denied.

## B.  <u>Negative Causation</u>

Next, Defendants contend that the CAC supports a finding of "negative causation," an affirmative defense which proves that Plaintiff Fritsche's losses were not attributable to the alleged Securities Act violations.

Although Plaintiffs are not required to allege loss causation with respect to their Securities Act claims, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010), these statutes make "the absence of loss causation, also known as 'negative causation,' an affirmative defense to reduce or avoid liability."  *Levine*, 508 F. Supp. 2d at 272.  In particular, defendants may prove that any portion of a plaintiff's loss did not result from the assertedly false or misleading registration statement, 15 U.S.C. § 77k(e), or prospectus or oral communication, 15 U.S.C. § 77*l*(b).  As an affirmative defense, defendants bear the "heavy burden" of proving that a plaintiff's losses were caused by something other than the alleged violations.  *See*

*Akerman*, 810 F.2d at 340-41 (citation omitted).  "Defendants' heavy burden reflects Congress' desire to allocate the risk of uncertainty to the defendants . . . ." *Id.* at 341.

"Defendants' burden, however, is not insurmountable . . . ." *Id.*  Although negative causation is generally established on a motion for summary judgment or at trial, *Levine*, 508 F. Supp. 2d at 272-73, a complaint may be dismissed prior to defendant's answer if "it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue."  *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F.Supp.2d 584, 588 (S.D.N.Y. 2011) (Holwell, J.) (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)).

In this case, Defendants argue that Plaintiff Fritsche's losses cannot plausibly have resulted from any misstatements in the Offering Documents because Fritsche sold his shares four months before regulators halted NIVS trading.  (WestPark Mem. 12; *see also* R&R Mem. 9-12). Plaintiffs respond that "the inquiry into negative causation is fact-intensive" and inappropriate for resolution on a motion to dismiss.  (Pls.' Mem. in Opp'n 37-38 [Dkt. No. 86]).  Plaintiffs contend that a finding of negative causation is inappropriate because Defendants have not offered "expert scientific evidence" regarding how NIVS's stock would have performed during the time period at issue.  (*Id.* at 38).

Although the Court is acutely aware that Defendants bear a heavy burden to establish their affirmative defense, the Court finds that the specific allegations of this case present a rare circumstance where negative causation is clear from the face of the complaint.

It is well established that the mere allegation that Fritsche purchased NIVS stock at an inflated price does not, on its own, allege a loss; rather, it is only when the misrepresented "facts . . . become generally known[,] and *as a result* share value depreciates," that a plaintiff suffers a

loss.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344 (2005) (emphasis added and internal

quotation marks omitted).[8]  Realizing this, the CAC alleges a "corrective disclosure-price drop"

theory of causation—namely, that on March 24, 2011, MaloneBailey revealed the falsity of

NIVS's financial documents and NIVS's stock price plummeted as a result.  *See In re State St.

Bank & Trust*, 774 F. Supp. 2d at 589 ("*Dura* . . . emphasized what is known as a 'corrective

disclosure-price drop' paradigm in its discussion of loss causation in securities fraud actions.").

Although the CAC alleges such a theory of causation, Plaintiff Fritsche, having sold all

his stock well prior to the corrective disclosures, cannot benefit from this theory.  In these

circumstances, Fritsche's losses may not be attributed to the misrepresented facts that became

generally known in March 2011.  *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp.

2d 404, 419 (S.D.N.Y. 2009) (Cote, J.) (finding stock price drop that "had already occurred even

before" "sole disclosure upon which Plaintiff relies to establish loss causation" were not

recoverable losses because a "priced decline before disclosure may not be charged to

defendants"); *Levine*, 508 F. Supp. 2d at 273-74 (same); *In re Merrill Lynch & Co., Inc.

Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) (Pollack, J.) (same).  As

the Second Circuit concluded in an analogous context, "in-and-out traders"— investors who

purchased shares during the class period but sold those shares before the misrepresentation was

---

[8] Although *Dura* addressed loss causation in the context of Section 10(b) and Rule 10b-5 claims, courts have employed its reasoning to analyze loss causation in Section 11 claims.  *See, e.g., In re State St. Bank & Trust Co.*, 774 F. Supp. 2d at 590 n.4.  Of course, the Court does not cite *Dura* to imply that Plaintiffs here are required to *allege* loss causation—this is clearly not required under Section 11.  Rather, the Court relies on *Dura*'s instruction that plaintiffs who purchase stock at an inflated price, "at the moment the transaction takes place, . . . [have] suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value."  *Dura*, 544 U.S. at 342.  Even "[w]hen the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Id.* at 342-43.

disclosed—would not "even 'conceivably' be able to prove loss causation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009).

Because Fritsche's losses are not attributable to information that came to light in the corrective disclosures, Defendants have established their negative causation defense.[9] *See, e.g.*, *In re Smart Techs., Inc. S'holder Litig.*, No. 11 Civ. 7673, 2013 WL 139559, at *9 (S.D.N.Y. Jan. 11, 2013) (Forrest, J.) ("Thus, any losses on sales prior to November 9, 2010, *necessarily* would be attributable to something *other than* the alleged misstatements or omissions in the Offering Documents."); *In re Giant Interactive*, 643 F. Supp. 2d at 572 (noting that courts have found negative causation where "the drop in stock price occurred prior to the disclosure of negative information to the public"); *see also Dean v. China Agritech, Inc.*, No. 11 Civ. 1331, 2011 WL 5148598, at *8 (C.D. Cal. Oct. 27, 2011) (approving negative causation defense where named plaintiff "sold his stock at a loss . . . approximately seven months before the [corrective disclosures]"); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005) (same); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (same).

Accordingly, because Defendants have established negative causation, Plaintiffs' Securities Act claims are dismissed.[10]

## IV.    THE EXCHANGE ACT CLAIM

Plaintiff Fritsche, again on behalf of himself and the class, asserts a claim against MaloneBailey under Section 10(b) of the Exchange Act and SEC Rule 10(b)-5.  Section 10(b)

---

[9] The CAC alleges no alternative theory of causation, such as "leakage" of the undisclosed information into the marketplace prior to the ultimate disclosure.  *E.g.*, *Levine*, 508 F. Supp. 2d at 273-74; *compare In re Shoretel Inc., Sec. Litig.*, No. 08 Civ. 00271, 2009 WL 248326, at *6 (N.D. Cal. Feb. 2, 2009); *with In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 247 F.R.D. 32, 41 (D.D.C. 2008).

[10] Having determined that Defendants have established negative causation, the Court does not address Defendants' arguments that Plaintiffs have not adequately alleged any material misstatements.

makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . .

any manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for

any person to "make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5.  In

order to state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Erica P. John Fund,*

*Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (quotation marks omitted).  These

allegations must also satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.

*See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *see also* 15 U.S.C. § 78u-4(b)(1).

In its motion to dismiss, MaloneBailey argues that Plaintiffs have failed to adequately

allege a number of the required elements of their claim, including a material misrepresentation,

scienter, and loss causation.  Having concluded that Defendants have established negative

causation with respect to Plaintiffs' Securities Act claims, the Court begins by addressing loss

causation.  For many of the same reasons discussed with respect to negative causation, the Court

concludes that Plaintiff Fritsche has failed to adequately allege loss causation.

Loss causation is "the proximate causal link between the alleged misconduct and the

plaintiff's economic harm."  *ATSI Commc'ns*, 493 F.3d at 106-07 (citing *Dura*, 544 U.S. at 346).

The Court must consider whether Plaintiffs have established loss causation with respect to

MaloneBailey separate from the other Defendants.  *See Lattanzio v. Deloitte & Touche LLP*, 476

F.3d 147, 157 (2d Cir. 2007) (considering whether an auditor caused plaintiff's loss separate

from whether an issuer caused the loss).  The Second Circuit has described the "two requirements necessary to establish loss causation: 1) the loss must be foreseeable, and 2) the loss must have been caused by the materialization of the concealed risk." *In re Flag*, 574 F.3d at 40.  Foreseeability requires a plaintiff to "prove that the risk 'was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor.'" *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)); *see also In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (Kram, J.) (same).

Although Defendants bear the burden of establishing the affirmative defense of negative causation, Plaintiffs bear the burden of adequately alleging loss causation.  *See Levine*, 508 F. Supp. 2d at 272-73; *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) (Cote, J.).  In dismissing the Securities Act claims, the Court held that Defendants carried their burden of establishing negative causation.  *See supra* Part III.B.  Given that Plaintiffs have alleged no additional facts relating to loss causation that might distinguish their Exchange Act claim, the Court is compelled to dismiss this claim as well.[11]

The allegation that Fristche purchased his shares at an inflated price is insufficient, on its own, to establish loss causation.  *See Dura,* 544 U.S. at 342-43.  Moreover, although Plaintiffs have alleged a "corrective disclosure to the market" which revealed the falsity of prior statements and caused a drop in share prices, *see Lentell*, 396 F.3d at 175 n.4, as discussed with respect to negative causation, Plaintiff Fritsche cannot tie his losses to the corrective disclosure because he sold his shares before it occurred.  *See, e.g.*, *Dean*, 2011 WL 5148598, at *6 (noting that while the complaint otherwise pled loss causation, named plaintiff's certification "clearly show[ed] that [plaintiff] sold his stock prior to the [corrective disclosure], rending his loss causation allegations

---

[11] The CAC's Exchange Act allegations include additional facts regarding the falsity of MaloneBailey's audit report and MaloneBailey's scienter, but they do not relate to loss causation.  (*See, e.g.*, CAC ¶¶ 225-236; 252-255 (identifying numerous "red flags")).

implausible"); *In re Britannia Bulk*, 665 F. Supp. 2d at 419 (finding price decline that occurred before "sole disclosure upon which Plaintiff relies to establish loss causation" may not be charged to defendants (citing *McMahan*, 65 F.3d at 1049)).  Nor does the CAC offer an alternative theory upon which Fristche's losses might be attributable to Defendants' false and misleading statements.

Accordingly, Plaintiffs' Exchange Act claim is dismissed.[12]

## V.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED.  Plaintiffs are given thirty days to file an amended complaint, should they choose to do so.


SO ORDERED.

DATED:       New York, New York
             March 12, 2013


                                    /s/_____
                                         KIMBA M. WOOD
                                    United States District Judge

---

[12] In granting the motion to dismiss for lack of loss causation, the Court does not address Defendants' alternative arguments regarding Plaintiffs' failure to adequately allege falsity and scienter. Should Plaintiffs choose to amend their Complaint, Plaintiffs may also bolster their allegations relating to the discrepancies between NIVS's SAIC and SEC filings.  *See In re China Valves Tech. Sec. Litig.*, No. 11 Civ. 0796, 2012 WL 4039852, at *6 (S.D.N.Y. Sept. 12, 2012) (Kaplan, J.) ("The factually similar cases cited by the parties demonstrate that when a securities fraud claim is based on discrepancies between AIC and SEC filings, the plaintiff must allege at least some facts to support that (1) the SEC figures, and not the AIC filings, are false, and (2) any variation is not attributable to variations in reporting rules or accounting standards.").